NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHARLENE MORISSEAU,

*Plaintiff,*

v.

BOROUGH OF NORTH ARLINGTON,
et al.,

*Defendants.*

Civil Action No. 16-837

OPINION

**THIS MATTER** comes before the Court by way of seven separate motions brought by Defendants Ronald Rosensweig, Esq. ("Rosensweig"), Amster & Rosensweig ("A&R"), Coccia Realty ("Coccia"), Jan Kwapniewski ("Kwapniewski"), Judge Peter Doyne ("Judge Doyne"), Judge Susan Steele ("Judge Steele"), Judge Joseph Rosa ("Judge Rosa"), Jacqueline Shulman ("Shulman"), Arthur Hoffman ("Hoffman"), Toni Byrne ("Byrne"), Joseph Fontinha ("Fontinha"), Maria Schmitt ("Schmitt"), Bergen County Sheriff's Office ("Bergen Sheriff"), and Bergen County SWAT ("Bergen SWAT") (collectively, "Moving Defendants" and, together with Borough of North Arlington ("North Arlington"), North Arlington Police Department ("North Arlington PD"), Unnamed Regional SWAT ("Unnamed SWAT"), Police Chief Louis Ghione ("Chief Ghione"), Douglas Bern ("Bern"), Sergeant Gary Edwards ("Sgt. Edwards"), Lynne Edwards, Gina Marshall ("Marshall"), Colleen Doherty ("Doherty"), Steven Lepore and Donna Lepore ("the Lepores"), Michael Grieco and Theresa Grieco ("the Griecos"), and Rubenstein, Meyerson, Fox, Mancinelli, Conte & Bern ("Rubenstein"), the "Defendants"), ECF Nos. 57, 58, 59, 66, 70, 71, 77, to dismiss <u>pro</u> <u>se</u> Plaintiff Charlene Morisseau's ("Plaintiff's") Amended

1

Complaint, ECF No. 33.  For the reasons set forth below, (1) each of those motions is **GRANTED**, (2) Counts 2 through 9, 19 through 22, 24, 25, 27, and 28 of the Amended Complaint are **DISMISSED** with prejudice; (3) Counts 1, 12 through 18, 23, and 26 are **DISMISSED** without prejudice; and (4) Counts 10 and 11 are **DISMISSED** without prejudice against all Defendants other than Steven Lepore.  If Plaintiff wishes to re-plead any claims that are dismissed today without prejudice, she is instructed to do so in accordance with this Opinion.

## I.  BACKGROUND

This case concerns Plaintiff's eviction from her North Arlington, New Jersey apartment and the events and circumstances leading up to the eviction.  Plaintiff brings assorted constitutional, statutory, and common law claims against the 29 Defendants, which include her landlord (Steven Lepore), her landlord's mother and property manager (Donna Lepore), her landlord's attorneys (Rosensweig and A&R), her landlord's realtors (Kwapniewski and Coccia), her neighbors (Byrne, Fontinha, and the Griecos), North Arlington health officials, township employees, and police officers (Doherty, Schmitt, Hoffman, Bern, Lynne Edwards, Marshall, Chief Ghione, and Sgt. Edwards), municipal and county parties (North Arlington, North Arlington PD, Bergen Sheriff, Bergen SWAT, and Unnamed SWAT), and the judiciary personnel tasked with adjudicating her housing case (Judge Doyne, Judge Steele, Judge Rosa, and Shulman).  According to Plaintiff, this large and disparate set of Defendants, essentially everyone

connected in any way to the housing case she lost, conspired together against her in what amounted to a "lynching." Am. Compl., ECF No. 33 p. 7.[12]

### A.  Factual Background

#### i.    Tenancy issues

In February of 2013, Plaintiff moved into the third floor of an apartment building in North Arlington, of which Steven Lepore was the landlord and Donna Lepore was the property manager. Am. Compl. pp. 22-23.  Byrne and Fontinha shared a different apartment in the same building, as did Michael and Theresa Grieco.  Id. p. 23.  On October 16, 2013, Steven Lepore filed an eviction action against Plaintiff for failure to pay rent.  Id. p. 4.  On January 29, 2014, Judge Steele signed an eviction order against Plaintiff.  Id. p. 5.  On February 14, 2014, after refusing to comply with an earlier Warrant of Removal, Plaintiff was forcibly removed from her apartment by Bergen SWAT.  Id. p. 6.

In August 2013, Plaintiff called the police after "Theresa Grieco . . . put a hole in [Plaintiff's] entryway, broke furniture and told [her] to 'go back where [she] came from.'"  Id., p.

---

[1] At the outset, the Court notes the Amended Complaint contains 53 pages of single-spaced text, and many of its factual allegations bear attenuated or no apparent relevance to Plaintiff's numerous claims.  The Amended Complaint also bounces between the 29 Defendants and the 28 Counts, and it is often unclear which facts and details are proffered to support which Counts.  Courts have dismissed similarly prolix pleadings as non-compliant with Fed. R. Civ. P. 8, because they can be unnecessarily confusing and can frustrate the Court's ability to adjudicate the plaintiff's claims. See, e.g., Giles v. Phelan, Hallinan & Schmieg, L.L.P., 901 F.Supp.2d 509, 530 (citing In re Westinghouse Sec. Litig., 90 F.3d 696 (3d Cir. 1996)).  In light of today's Opinion, the Court is not inclined to do so here, but Plaintiff is instructed that any amended pleading must contain "only those allegations relevant to . . . the remaining viable claims."  Id. (quoting In re Westinghouse Sec. Litig., 90 F.3d at 703).

[2] The Court also notes that, although Plaintiff appears pro se, she is a Harvard Law School graduate and disbarred attorney, see In re Morisseau, 117 A.D.3d 1168, 1169 (N.Y. App. Div. 2014), who has already been precluded from appearing before at least one U.S. District Court after perpetrating "a series of unsupported and hate-filled public attacks" against lawyers and judges she perceived to be Jewish, In re Morisseau, 763 F.Supp.2d 648, 663 (S.D.N.Y. 2011).

3.   Grieco allegedly became angry after Plaintiff "mopped the floor" due to "a nasty smell throughout the hallway."   Id.  Grieco allegedly subjected Plaintiff to verbal abuse and allegedly "ripped down the blinds from the window in [Plaintiff's] entryway, tore a hole in the entry wall, banged-in the door to a piece of furniture [Plaintiff] had in the hallway and tipped the furniture until it made a hole in the ceiling."  Id. p. 24.  Officers Feola and Sandowick (presumably with the North Arlington PD) allegedly "attempted to intimidate [Plaintiff] from filing a report . . . telling [her], 'That's not how we do things around here.'"  Id. p. 3.  Plaintiff went to the police station and attempted to file a police report anyway, at which time Sgt. Edwards directed her "to file a court complaint instead."  Id. p. 4.

      At a hearing in municipal court, the local judge "told [Plaintiff] to report the house smell and [her] sudden illness to the city's Health Dept."  Id.  Plaintiff did so, and claims she spoke with Colleen Doherty, following up via email on October 8, 2013.  Id.  According to Plaintiff, this day also marked the beginning of "months of retaliation by the landlord and other tenants, including nearly weekly police harassment."  Id.  In response to the repeated filing of "false reports against [Plaintiff]" by Plaintiff's neighbors, "[p]olice officers would just arrive at [Plaintiff's] door and start pounding on it, demanding [she] come outside . . . .  The officers never had a legal basis for any crime."  Id.

      Plaintiff also claims her neighbors "made threats against [Plaintiff] and [her] dog, spit at [her], put a bookshelf of porn magazines in the front entry, spread malicious rumors, threw [her] against a wall, etc."  Id.  Plaintiff alleges verbal abuse and threats by her neighbors (including alleged racial slurs), disputes regarding the heat in the apartment building, and various other altercations.  Id. pp. 25-30.  For example, Plaintiff sets forth in detail a dispute regarding her use (or alleged use) of washing machines belonging to her neighbors.  Id. pp. 26-27.

On October 5, 2013, Plaintiff complained to the Lepores regarding what she alleges was "a bookshelf of porn in the hallways." Id., p. 8. Four days later, after a complaint by Plaintiff, the Department of Children and Families ("DCF") conducted an investigation of Byrne and Fontinha, who had two minors in their residence. Id. That same day, according to Plaintiff, Sgt. Edwards wrote a police report on behalf of Byrne and Fontinha, stating that Plaintiff's complaint to DCF was unfounded and a basis for harassment. Id. Plaintiff "wrote letters to DCF, asking who was identifying [Plaintiff] as a caller and who had released info that the complaint was 'unfounded.'" Id. p. 9. Sgt. Edwards allegedly "amended the police report to state that DCF had not been a source for the police report[,]" and "admitted having written it without an investigation and without basis." Id. Yet, Plaintiff claims "he did not remove the police report or take action against Byrne and Fontinha." Id.

Plaintiff alleges that her neighbors "each and all told Plaintiff they intended to get her evicted." Id. p. 46. She also claims that Plaintiff's access to the basement was padlocked "because of false reports by the co-tenants." Id. p. 47. Plaintiff claims her neighbors were motivated by racial animus and by retaliation, due to Plaintiff's filing of various "police and court complaints" and the DCF complaint. Id.

Ultimately, Plaintiff alleges the Lepores began "supporting the other tenants, including turning off the heat and lights in the stairwells, issuing parking tickets to church missionaries who visited [Plaintiff] when they parked in [her] driveway, padlocking the basement door but giving keys to all the other tenants, holding [her] property locked in the basement, barricading [her] backstairs' exit, etc." Id. p. 4. Kwapniewski and Rosensweig also allegedly assisted the Lepores in "running [Plaintiff] ragged." Id. p. 31. Plaintiff claims that Kwapniewski was "assisting the landlord, co-tenants, and police in maliciously defaming [Plaintiff] and setting [her] up for state

action (i.e., gas lighting)." Id. p. 32.  Rosensweig "sent angry responses whenever [Plaintiff] sent him emails."  Id. p. 33.

### ii.    Municipal mediation

In November 2013, in the course of pursuing recommended mediation against Theresa Grieco, Plaintiff dealt with Gina Marshall, the North Arlington Municipal Court Administrator, and alleges that Ms. Marshall: (1) "threw [Plaintiff's] mediation documents in the trash"; (2) "refused to take letters [Plaintiff] delivered for the court about the proceedings"; (3) failed to mail "notice of a mediation date"; (4) "named [Plaintiff] as the 'defendant' in the mediation records, instead of as the complainant"; and (5) told Plaintiff that she "was not to file a complaint against Theresa Grieco, and then called the police on [Plaintiff] when [Plaintiff] asked for something in writing. Id., p. 7.  At some point, Plaintiff confronted Ms. Marshall "about the problems with her administration of the mediation" and asked her "if she had any personal relationship with Grieco or the Lepores."  Id.  Ms. Marshall allegedly began threatening Plaintiff, yelling at Plaintiff, and asking Plaintiff if she was recording her.  Id.

In response, Plaintiff claims she "filed a court complaint against Marshall for 'witness intimidation.'  All of the cases got transferred to the Bergen County Municipal Court on the basis of conflicts of interest with Marshall."  Id.  On March 20, 2014, Judge Roy McGeady of Bergen County allegedly stated at a hearing that Marshall "had entered a finding of probable cause against [Plaintiff] for charges filed by Theresa Grieco."  Id. pp. 7-8.  Judge McGeady allegedly found "that Marshall did not have the authority to enter probable cause hearings and had done so without the local judge's consent.  He vacated Marshall's probable cause finding."  Id. p. 8.

### iii.    Construction Department letter and December 2013 court order

In November 2013, Plaintiff made a complaint to North Arlington's Construction Department, which conducted an inspection of the apartment building in November 2013 and issued a letter to Steven Lepore on December 5, 2013, "stating Lepore had a series of code violations" and notifying him "that he had not filed a Certificate of Occupancy . . . for the apartment." Id. Plaintiff alleges the Construction Department sent a second letter in January 2014 and "summoned Lepore to municipal court twice for the violations." Id. p. 5. In the midst of this, Lepore brought a second eviction action against Plaintiff on December 20, 2013, for failure to pay rent. Id. Plaintiff also learned that the property "had been in foreclosure since May 2013, and that the landlord, Lepore was in foreclosure on numerous other properties." Id. Plaintiff claims a "toxic smell" arose in late June 2013. Id.

In December 2013, Plaintiff claims she "received a court order from the Superior Court, Bergen County, Justice Center, for Lepore to remove the padlocks from the basement door." Id., p. 8. Plaintiff alleges Shulman "told the police by phone not to enforce the order" but "backed-off" when Plaintiff called Judge Steele's chambers to object, stating that "the order was enforceable." Id. Plaintiff claims she "told the police, but they balked. Police Chief Ghione had instituted a practice that the police officers were not to enforce court orders that tenants secured from the Bergen County Landlord-Tenant Court." Id.

Plaintiff filed yet another police report "to have the court order enforced" and went to the police department in January 2014 "to retrieve a copy of the police report." Id. Plaintiff alleges she heard Lynne Edwards in the back, telling Chief Ghione that Plaintiff was a "snitch." Id. Plaintiff alleges Edwards, who is the mother of Sgt. Edwards, was "angry." Id. Plaintiff claims that Chief Ghione "came to the window, practically running, and started telling at [Plaintiff] not to enforce the court order for the padlocks to be removed." Id. Plaintiff requested to record Chief

Ghione, stating that she "would otherwise only speak to him with an attorney present . . . ." Id.

Chief Ghione acquiesced.  Id.

Plaintiff claims she handed the letter regarding Lepore's alleged lack of a Certificate of Occupancy ("CO") directly to Chief Ghione.  Id. p. 5.  Chief Ghione supposedly scanned the letter into police records.  Id.  Plaintiff also tried to file "a complaint of forcible eviction against . . . Steven Lepore[,]" which "the police department had refused to take" after repeated efforts by Plaintiff.  Id.  "Sgt. Edwards had repeatedly interfered and refused to allow [Plaintiff] to file a police report against Steven Lepore."  Id.  Additionally, when Plaintiff "finally filed this police report, Ghione assigned Officer Feola, against whom [Plaintiff] had already filed an [Internal Affairs] report, to do it."  Id.  According to Plaintiff, he "intentionally messed up the report about Lepore so badly, it had to be amended."  Id.  Plaintiff took issue with Sgt. Edwards's involvement in addition to Officer Feola's, since Plaintiff had also "already reported Edwards to the city attorney, Doug Bern, and to Ghione for misconduct."  Id.  In fact, Plaintiff "had also reported police harassment and Ghione's effort to keep [her] from enforcing a court order against Lepore." Id.

Plaintiff also took issue with Shulman's alleged intervention with respect to the enforcement of the same order, claiming that "Shulman violated the code of professional conduct." Id., p. 15.  Plaintiff also "issued a subpoena to Shulman to testify" in separate criminal proceedings (ostensibly the March 20, 2014 hearing before Judge McGeady), "which would have addressed the court order that Shulman and the police blocked, as well as Donna Lepore's conduct in restraining Plaintiff's property in the basement."  Id.  However, when Shulman arrived, she allegedly "approached the bench and announced herself as a clerk of court" and "discussed off record with the judge."  Id.  Judge McGeady then "pulled away and advised her openly that she

would not have to appear in court again." Id. According to Plaintiff, "Shulman blocked the subpoena without filing opposition or notice to Plaintiff, but by using her personal influence with the judge." Id.

### iv. January 7 incident and alleged police harassment

Plaintiff again called the police on January 7, 2014, after she alleges she "was attacked by other tenants." Id. p. 9. After a disagreement over the temperature in the apartment building, Plaintiff called a PSE&G technician, which Plaintiff alleges upset the other tenants, who then "ganged up on me, pushed me into a wall, threatened to 'stab my dog in the eye,' etc." Id. Sgt. Edwards and Officer Giuseppe Rinzivillo allegedly responded to Plaintiff's call, and ostensibly took the report. Id. Plaintiff allegedly took a video of the encounter and emailed it to police dispatch after Sgt. Edwards and Officer Rinzivillo left. Id.

Within an hour, Plaintiff alleges that Sgt. Edwards returned and "had come back to bang wildly on [Plaintiff's door], demanding that [Plaintiff] open it. He kicked the door and tried to rattle the knob when [Plaintiff] told him [she] would not step outside." Id. Plaintiff claims Sgt. Edwards began "threatening" her, saying things like "Charlene, come outside now!", "You better come out or you'll regret it!", and "I'm done with you! Hear me, I'm done with you!" Id. Plaintiff claims she heard someone say "pull your gun" but the incident supposedly ended when Plaintiff informed the officers outside that she was on the phone with police dispatch. Id.

### v. City Council meeting and alleged evidence mismanagement

Plaintiff alleges that Chief Ghione "refused to take evidence of" Plaintiff's neighbors assaulting her, stating that "his department does not take evidence from citizens and does not keep an evidence log." Id. p. 9. Plaintiff allegedly reported this refusal to take evidence as well as "police harassment" at a City Council meeting on January 14, 2014. Id. At this meeting, Plaintiff

claims "Mayor Peter Massa instructed the city attorney, Doug Bern, and Ghione to meet with [Plaintiff]." Id. Chief Ghione ultimately took the videos but allegedly stated he was simply doing Plaintiff a "courtesy" in filing them as police evidence. Id. p. 10.

At that meeting, Plaintiff claims when she "spoke on record about the police's failure to maintain evidence of the co-tenant's attack, Bern started sweating profusely and avoided eye contact. . . ." Id. p. 22. Bern allegedly stated "the city had no duty to accept or preserve evidence from citizens," and although the videos were supposedly accepted anyway as a "courtesy," Bern subsequently "made himself unavailable" to Plaintiff by "disengag[ing] his email." Id.

Plaintiff claims that Michael Grieco and Joseph Fontinha were set to be prosecuted on April 24, 2014, but charges were dropped "because the state was not ready for trial." Id. Plaintiff alleges that the prosecutor "went on record at trial that day, stating that Ghione had not given her the videos of the assault, and the police department had no evidence of the crime." Id. Plaintiff also alleges that "Ghione had also interfered with [Plaintiff's] self-discovery requests when [Plaintiff] was self-represented in defending charges filed by Toni Byrne and Theresa Grieco" and that "emails with Ghione, detailing same, are also in police custody." Id.

### vi.    Additional allegations against North Arlington Police Department

Plaintiff "went to the North Arlington Police Department repeatedly to file reports against the other tenants and the landlord" and claims the "officers refused to take the complaints." Id. p. 10. According to Plaintiff, they "stated it was the Department's practice not to accept walk-ins. [Plaintiff] was told to file court complaint forms, and to go seek redress from a judge. They refused to allow [Plaintiff] to make any police reports/complaints." Id. Plaintiff claims that Byrne, by contrast, was allowed to file a "walk-in" report against Plaintiff, and when Plaintiff raised the issue with the officers, she was permitted "[f]or the first time . . . to file a walk-in report." Id.

Plaintiff claims she also filed Internal Affairs ("IA") complaints against Officers Feola and Sandowick, the "officers who arrived on scene on 8/31/13 regarding Theresa Grieco putting a hole in the wall and threatening [Plaintiff]." Id. Although Plaintiff took issue with the officers' handling of the incident, Plaintiff "received a letter from Chief Ghione, stating that Sandowick was cleared after an IA investigation." Id. Plaintiff complains that she "had made the report to Captain John Hearn and Officer Prinzo, who [Plaintiff] was told were the IA officers on duty when [she] filed the report[,]" and she "did not know why Ghione was writing the letter." Id. Plaintiff says she "called Captain [Scott] Hedenberg and left a message, asking why Ghione was interfering in the IA investigation and asking where was the finding regarding Officer Feola" and claims that "Ghione was interesting in [Plaintiff's] complaints against his officers." Id.

Plaintiff further claims that "Chief Ghione began changing the CFS Codes to the police calls that [Plaintiff] made whenever the police came banging on [Plaintiff's] door" and "marked them as discarded." Id. She takes issue, as well, with the alleged refusal of North Arlington PD's Records Room "to give [Plaintiff] copies of police reports" concerning Plaintiff and her neighbors, even though she "had gotten copies of reports before." Id. p. 11. Chief Ghione allegedly told Plaintiff "that any police reports [Plaintiff] had gotten before were a 'courtesy'" and "placed the Records Room under instructions to deny [Plaintiff] access to police services." Id.

### vii. Alleged retaliation related to Health Department complaints

Plaintiff claims that when she "filed the initial complaint with the Health Dept., the Administrator, Colleen Doherty, attempted to dissuade [Plaintiff] from filing it." Id. p. 11. According to Plaintiff, Doherty "stated the Dept. would have to 'investigate [Plaintiff's] dog' as well as the neighbors to make sure there was no smell." Id. Plaintiff says she told Doherty that she "did not want the dogs of the house bothered, including [Plaintiff's], because the smell seemed

more toxic, rather than dog waste." Id. Doherty allegedly told Plaintiff Doherty "would have to 'notify the landlord' and 'sometimes that causes problems.'" Id.

Doherty allegedly urged Plaintiff to keep the complaint "verbal" but agreed to "notify the Health Inspector, Schmitt, by phone about the odor and [Plaintiff's] illness." Id. Upon Plaintiff's insistence, Doherty agreed to "'check the Dept.'s files for prior complaints' about the property and the area." Plaintiff claims Schmitt then "left a voicemail message that there were no prior complaints in the files." Id. When Plaintiff followed up regarding her complaint, she alleges "Sgt. Edwards filed a complaint against [Plaintiff's] dog." Id. When Plaintiff took her complaints to the Bergen County Health Department, she claims she received another complaint from North Arlington health officials regarding her dog. Id.

Plaintiff also claims she reached out weeks later and attempted "to file a written complaint about the co-tenants placing dog waste in the backyard and having their dogs unleashed." Id. Plaintiff states that Doherty told her "for the first time that the Health Dept. does not have a written complaint form" and that "it was the 'practice' of the Health Dept. to only take complaints verbally." Id. Plaintiff claims this means that "it was false when [Doherty] and Schmitt told [Plaintiff] in Oct. 2013 that they searched files for prior complaints. How can they search for complaints that could not have been written down?" Id.

Plaintiff then "decided to send another email, this time re: the dog waste in the backyard" and "also reported the heat being turned off on 1/7/14." Id. Plaintiff alleges she "received additional complaints from the health Dept. regarding [her] dog." Id. Plaintiff claims she requested "copies of the files Doherty had searched regarding the smell" and "Doherty stated there was nothing that could have caused the odor." Id. When Plaintiff noted there was nearby construction "where the ground was torn up" and told Doherty that "PSE&G had also stated that

there had been reports of a possible gas leak because of a bad smell" nearby, "Doherty stated she did not know what [Plaintiff] was talking about." Id. Plaintiff states that their emails "are on email at the Health Dept. and [Plaintiff] copied the City Attorney, Douglas Bern." Id.

Plaintiff requested Maria Schmitt's email, but Doherty allegedly stated that Schmitt did not have one. Id. Plaintiff claims she "then learned that she did and forwarded the emails to Schmitt." Id. Plaintiff reported her concerns at the 1/14/14 City Council meeting "to the Mayor and council members, in addition to reporting the police harassment and Ghione's misconduct." Id. Plaintiff "also reported to the Town Administrator, Kean, that Doherty and Schmitt violated state and federal regulations for operating protocols." Id. Plaintiff claims that Doherty and Schmitt were "suppressing complaints," "not identifying potential toxic exposure," failing "to investigate [Plaintiff's] health problems that developed because of an odor at 100 Crystal Street," "retaliat[ing] against [Plaintiff]," and "cooperat[ing] with the police department to do so." Id.

### viii. Eviction proceedings

Steven Lepore filed his first eviction action against Plaintiff on October 16, 2013, which was apparently dismissed because Plaintiff was not served by the court constable, Arthur Hoffman. Id. p. 4. However, Plaintiff also claims that she "proved that [she] did not owe rent because [she] had legally applied [her] security deposit." Id. After allegedly "advising [the Lepores] on how to evict [Plaintiff] . . . Judge Steele dismissed on procedural grounds because of Hoffman's defective service only, not because [Plaintiff] did not owe rent or because of the retaliation." Id. Plaintiff claims this proceeding was "retaliatory" and also takes issue with Judge Steele's decisions to allow "the Lepores to attend the hearing via phone, rather than in person" and to "not even bother to swear in Donna Lepore[.]" Id.

At a second eviction hearing on January 29, 2014, Judge Steele signed an eviction order, apparently despite evidence that Steven Lepore did not have a CO. Id. p. 5. According to Plaintiff, "Lepore and his lawyer, from corporation Amster & Rosensweig, stated that Lepore had a CO." Id. Plaintiff alleges she confirmed the following week with Robert Kairys, the Construction Department Chief, that the apartment had never had a CO. Id. Along with the CO issue, Plaintiff alleges various other forms of misconduct by Judge Steele in connection with the eviction proceeding, including failing to "discipline or remove Shulman from the cases" due to Shulman's alleged interference with Plaintiff's court order regarding the basement padlocks, "refus[ing] to consider any of Plaintiff's testimony regarding reprisals or harassment in all subsequent proceedings[,]" and "instruct[ing] her staff to keep the files separate from the files that were disclosed to the public and the Plaintiff, despite using the personal data to inform her judicial action." Id. p. 17.[3]

On February 10, 2014, Plaintiff says she "reported Steele and Rosa to the Bergen County Prosecutor's Office, and named [Lepore] and his lawyer (Ronald Rosensweig)." Id. p. 5. Plaintiff "also reported the police harassment again." Id. According to Plaintiff, Judge Steele ultimately recused herself from the eviction proceeding (but did not stay the eviction) on February 12, 2014. Id. p. 7. Although Judge Rosa notified Plaintiff of the recusal via email that same day, Plaintiff claims she did not receive the notice until after the day after her eviction. Id. Plaintiff alleges Judge Rosa also stated "he had been informed that there was a police emergency and that [Plaintiff] was refusing to attend a hearing." Id. Plaintiff claims Judge Rosa "got this information from

---

[3] Plaintiff also details third-party proceedings she "personally witnessed" in which she claims Judge Steele and her clerk, Shulman, engaged in impropriety and ultimately evicted tenants "despite the illegality of the eviction proceedings." Am. Compl. p. 17. Plaintiff obviously does not and cannot assert any cause of action on behalf of those third parties, but she apparently urges the Court to consider the incidents in its adjudication of Plaintiff's claims.

Ghione, who had in fact made direct contact with the judges and interfered in the eviction proceeding." Id.

Plaintiff alleges eviction proceedings were "unwarranted because the landlords had not complied with municipal code" and meant to "coerce Plaintiff to pay sums not allowed to the landlords or to vacate the property, to comply with new restrictive leases conditions . . . and to be submissive to the co-tenants." Id. p. 47. During the eviction process itself, Plaintiff alleges that "Rosensweig submitted false records to the court" and "engaged in ex parte communications with judicial officers[.]" Id. p. 46. After the Warrants of Removal were issued, Plaintiff claims the Lepores and their agents "used the court's rulings in [a] perverted manner to intimidate and harass the Plaintiff, including interfering with her property rights, instigating police action and a forcible eviction, evading prosecution, acts of violence and threats, etc." Id. p. 48.

### ix.    Warrant of Removal allegations

Plaintiff alleges that "for the October 2013 eviction action by Lepore, Hoffman claimed to have served [Plaintiff], as sworn to in his certification filed with the court for the December 2013 Warrant of Removal." Id. p. 13. Plaintiff claims, however, that when she "spoke to him via phone, he admitted he had not served the papers." Id. This was allegedly the basis on which Lepore's first eviction action was dismissed. Id.

Later, on February 11, 2014, Plaintiff received a Warrant of Removal in her mailbox, which she claims had been signed on February 4, 2014. Id. p. 6. Plaintiff alleges that Hoffman "wrote on the warrant that he had posted and mailed it. He had not. He also did not mail it. Someone just stuck it upright in my mailbox on the afternoon of 2/11/14." Id. After receiving this Warrant of Removal, Plaintiff "immediately went to the city's public library and wrote an email to [Hoffman]; the mayor of North Arlington, Peter Massa; County Freeholders, Tanelli and Ganz; [Chief

Ghione]; and Bergen County Prosecutor's Office Detective Ms. Ronnie Petzinger, advising that [Plaintiff] could not go to the court to appeal the notice in time."  Id.  Plaintiff "reminded them about the city's letter re: the landlord's failure to secure a CO" and reiterated her belief that the eviction was illegal.  Id.

On February 12, 2014, Hoffman allegedly came to Plaintiff's door "and started breaking the locks."  Id.  When Plaintiff confronted Hoffman, he allegedly threatened to kill her dog, at which point Plaintiff "started screaming and called the police."  Id.  When the police arrived, Plaintiff interacted with Chief Ghione and alleges he "was abusive and threatening."  Id.  Chief Ghione allegedly "accused [Plaintiff] of harboring racial bias, stating 'you think this is about race. It's not.'  Yet [Plaintiff] had not mentioned race."  Id.  When Plaintiff told Chief Ghione about the various reports she had filed against Lepore, Judge Steele, and Judge Rosa, Chief Ghione allegedly responded "Oh yeah.  Is that so?  You shouldn't have done that."  Id.  According to Plaintiff, he then said "he would be back" and Plaintiff should "be ready."  Id.  Plaintiff complains that she "spent hours on the phone with the court clerks on 2/12/14" but was not allowed "to speak to any judges for an emergency hearing."  Id.[4]

### x.    Additional allegations of misconduct by judicial personnel

Plaintiff claims "upon information and belief, after Judge Steele recused herself, Shulman remained active on the eviction case."  Id. p. 15.  She further alleges that "Shulman and Judge Steele maintained files with personal research about the Plaintiff."  Id.  When Plaintiff requested documents related to the eviction from the Bergen County Court, she claims she received "personal

---

[4] Plaintiff also alleges, at length, alleged past misconduct by Hoffman, relying upon an opinion of the New Jersey Appellate Division from 1988.  Am. Compl. p. 14.  Plaintiff obviously does not and cannot assert any cause of action in connection with this past conduct, but she apparently urges the Court to consider the incident in its adjudication of Plaintiff's claims.

records about an employment action that Plaintiff had been a part of over a decade ago" that were being maintained by Shulman and Judge Steele. Id. Plaintiff believes although Judge Steele and Shulman "never raised issue with these records in court or with the Plaintiff," they "informed the court's actions." Id. Plaintiff also alleges there were "additional documents that the court clerks refused to disclose." Id.

### xi. Forcible eviction and transport to Bergen Regional Medical Center

On February 14, 2014, Bergen County SWAT "forcibly removed [Plaintiff] from the apartment after breaking down the door." Id. "They had had a hostage negotiator at the door for hours . . . ." Id. Officer Feola allegedly "put a gun to [Plaintiff's] face, although [she] was unarmed and the other officers had already taken [her] dog away and had [Plaintiff] on the floor." Id. According to Plaintiff, the police arrested her, charged her with obstruction and trespass, impounded her dog, and "locked up the apartment and all of [her] belongings, including [her] wallet." Id.

Plaintiff alleges that Judge Rosa, who Plaintiff claims took over the case from Judge Steele on the day of the eviction, "refused to take any of [Plaintiff's] calls when she contacted the court on Feb. 14th, as the police SWAT were outside her door, and even as Rosa and Steele commandeered the police action." Id. pp. 18-19. Plaintiff claims that, on the day of the eviction, Judge Rosa sent an email to Plaintiff that she never received, and she consequently "had no formal notice that there were even to be any proceedings on Feb. 14th" regarding the eviction.[5] Id. p. 19.

---

[5] Here, Plaintiff again deviates from her own claims to detail third-party proceedings she "personally witnessed" in which she claims Judge Rosa "ignored the fact that the state court had no jurisdiction against" certain evicted tenants. Am. Compl. p. 19. Plaintiff obviously does not and cannot assert any cause of action on behalf of those third parties, but she apparently urges the Court to consider the incidents in its adjudication of Plaintiff's claims.

After the SWAT removal, Plaintiff was transferred to Bergen Regional Medical Center for observation. Id. p. 7. According to Plaintiff, "the doctor stated he would release [Plaintiff] because there was no grounds for committing [her]," but "the police objected. They said the SWAT action was the reason why; the police were saying [Plaintiff] was a threat." Id. As a result, Plaintiff spent a night in the hospital and was released the next morning." Id.

Plaintiff alleges the police "padded their intake report, stating that [Plaintiff] had been evicted before and threatened . . . prior neighbors with knives." Id. Plaintiff denies threatening anyone or making suicidal comments, and states "[t]here was no basis to place [her] under observation." Id. Plaintiff alleges [t]o this date, the state has also not made any indication to Plaintiff as to the disposition of her personal property that was at the apartment on the date of eviction[.]" Id. Plaintiff alleges "[u]pon information and belief, the state and the city defendants named herein destroyed the property after the eviction, in a further act against the Plaintiff, although the precise date is unknown." Id. In Plaintiff's eyes, "[t]his wasn't an eviction; this was a lynching." Id.

**B. Procedural Background**

Plaintiff filed her first complaint on February 16, 2016, ECF. No. 1, which was dismissed by the Court on February 17, 2017 due to Plaintiff's failure to serve any of the Defendants, ECF. No. 6. On March 31, 2017, Plaintiff requested the reopening of this action, as well as leave to amend the complaint. ECF No. 10. The Court reopened the action, and granted Plaintiff's request for leave on May 5, 2017. ECF No. 26. The Amended Complaint, now the subject of the present motions to dismiss, was filed by Plaintiff on June 9, 2017. ECF No. 33.

The Amended Complaint details 28 separate counts against varying sets of Defendants, many of which are alleged without any proffered factual basis: 42 U.S.C. § 1981, through § 1983

and 28 U.S.C. § 1658 ("Count 1"); Selective Enforcement under the Equal Protection Clause of the U.S. Constitution ("Count 2"); 42 U.S.C. § 1983 for Customary and Systemic Failure to Investigate and Inadequate Investigation of Citizen Complaints, Failure to Document and Mishandling of Government Records, Failure to Maintain Records of Complaints, Failure to Train, Failure to Supervise, and Failure to Discipline ("Count 3"); 42 U.S.C. § 1983 for violation of Plaintiff's rights under the First, Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution ("Count 4"); 42 U.S.C. § 1983 for Malicious Prosecution, Malicious Use of Process, Malicious Abuse of Process ("Count 5"); Retaliatory Prosecution ("Count 6"); Bystander Liability ("Count 7"); N.J.S.A. § 10:6-2(c) (New Jersey Civil Rights Act) ("Count 8"); 42 U.S.C. § 1983 for Conspiracy ("Count 9"); 42 U.S.C. § 1981 ("Count 10"); Tenant Reprisal Act, N.J.S.A. § 2A:42-10.11 et seq. ("Count 11"); New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 ("Count 12"); Breach of Contract ("Count 13"); Breach of Covenant of Good Faith and Fair Dealing ("Count 14"); Tortious Interference with Contract ("Count 15"); Tortious Interference with Prospective Economic Advantage ("Count 16"); Malicious Abuse of Civil Process ("Count 17"); Malicious Use of Process ("Count 18"); 42 U.S.C. § 1982 ("Count 19"); 42 U.S.C. § 1985(2) ("Count 20"); 42 U.S.C. § 1985(3) ("Count 21"); Common Law Civil Conspiracy ("Count 22"); Common Law Fraud ("Count 23"); State Law Offenses for False Imprisonment and False Arrest ("Count 24"); Invasion of Privacy ("Count 25"); State Law Offenses Against Plaintiff's Property Rights, including Trespass, Conversion, Negligence, Unjust Enrichment, and Property Damage ("Count 26"); Intentional Infliction of Emotional Distress ("Count 27"); and the New Jersey Constitution ("Count 28").

Each of the Moving Defendants have filed motions to dismiss all claims against them. ECF Nos. 57, 58, 59, 66, 70, 71, 77. The Court will address each of those claims, and Plaintiff's other remaining claims, in turn.

## II. STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the plaintiff. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id. The facts alleged, however, must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

For allegations sounding in fraud, Rule 9(b) imposes a heightened pleading standard, namely: "a party must state with particularity the circumstances constituting fraud or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The circumstances of the fraud must be stated with sufficient particularity to put a defendant on notice of the "precise misconduct with which [it is] charged." Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007).

Usually, these standards are relaxed in the pro se context. Courts liberally construe documents filed by pro se plaintiffs, and hold the filings to less stringent standards than those drafted by attorneys. Erickson v. Pardus, 551 U.S. 89, 94 (2007). But where, as here, the pro se litigant has legal training, that person is not afforded the latitude typically granted to lay plaintiffs. Turner v. New Jersey State Police, No. 08–5163, 2017 WL 1190917, at *7 (D.N.J. Mar. 29, 2017) ("Attorney pro se litigants are not accorded the same consideration as pro se litigants who lack substantial legal training."); see also Allen v. Aytch, 535 F.2d 817, 821 n.21 (3d Cir. 1976) (stating that a third year law student who drafted a complaint had "substantial legal training" and therefore declining to construe the complaint liberally). Furthermore, the Court is not required "to credit a pro se plaintiff's 'bald assertions' or 'legal conclusions.'" Gibney v. Fitzgibbon, 547 Fed.Appx. 111, 113 (3d Cir. 2013) (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)). That is, "[e]ven a pro se complaint may be dismissed for failure to state a claim if the allegations set forth by the plaintiff cannot be construed as supplying facts to support a claim entitling the plaintiff to relief." Id. (citing Milhouse v. Carlson, 652 F.2d 371, 373 (3d Cir. 1981)).

Because Plaintiff is proceeding in forma pauperis, the Amended Complaint is also subject to screening under 28 U.S.C. § 1915 ("Section 1915"). Pursuant to Section 1915, district courts are directed to review complaints and to dismiss sua sponte any action that: "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). In this context, a "frivolous" claim is one that "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989). The term "embraces not only the inarguable legal conclusion, but also the fanciful factual allegation." Id. Section 1915's standard for dismissing a complaint for failure to state a claim "is the same as that for dismissing a complaint pursuant to Federal Rule

of Civil Procedure 12(b)(6)." <u>Schreane v. Seana</u>, 506 Fed.Appx. 120, 122 (3d Cir. 2012) (citing <u>Allah v. Seiverling</u>, 229 F.3d 220, 223 (3d Cir. 2000)).

### III. ANALYSIS

#### A. Statute of Limitations

Various Moving Defendants assert a statute of limitations defense, and Section 1915 additionally dictates dismissal of claims that are clearly time-barred by the applicable statute of limitations. <u>See</u>, <u>e.g.</u>, <u>Ostuni v. Wa Wa's Mart</u>, 532 Fed.App'x. 110, 112 (3d Cir. 2013). When Plaintiff filed her initial complaint on February 16, 2016, she did so outside of the statute of limitations governing Counts 2 through 9, 19 through 22, 24, 25, 27, and 28. Accordingly, they are dismissed with prejudice.

In New Jersey, the applicable statute of limitations for all "actions for injury to persons by wrongful action" is two years. <u>See</u> N.J.S.A. 2A:14-2. This limitations period applies generally to personal injury claims, including in connection with: (1) § 1983 and other statutory civil rights claims, <u>see</u> <u>O'Connor v. City of Newark</u>, 440 F.3d 125, 126-27 (3d Cir. 2006)[6]; <u>Cito v. Bridgewater Twp. Police Dep't</u>, 892 F.2d 23, 25 (3d Cir. 1989); (2) false arrest and imprisonment claims, <u>Fleming v. United Parcel Service, Inc.</u>, 604 A.2d 657, 680 (N.J. Sup. Ct. 1992) (citing <u>Earl v. Winne</u>, 101 A.2d 535 (1953)); (3) invasion of privacy claims, <u>Rolax v. Whitman</u>, 175 F.Supp.2d 720, 726 (D.N.J. 2001); and (4) intentional infliction of emotional distress claims, <u>Pena v. Div. of</u>

---

[6] New Jersey's limitations period for personal injury-based claims, from which the Court is instructed to borrow for civil rights claims generally, is pre-empted by a four-year "catch-all" limitations period for all civil actions "arising under an Act of Congress" enacted after December 1, 1990. <u>See</u> 28 U.S.C. § 1658. Plaintiff's claims brought under 42 U.S.C. § 1981 (Counts 1 and 10) are subject to this four-year statute of limitations because the action appears to be based on language added by the Civil Rights Act of 1991. <u>See</u> <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369, 372 (2004).

Child & Family Services, No. 08-1168, 2010 WL 3982321, at *6 (D.N.J. Oct. 8, 2010) (citing Agcaoili v. Thayer, No. 2630, 2010 WL 528413, at *6-7 (3d Cir. Feb. 16, 2010)).

Plaintiff's allegations of personal injury span from August 2013 to February 2014, culminating with Plaintiff's eviction from her apartment on February 14, 2014. Thus, Plaintiff's various personal injury claims accrued, at the very latest, on February 14, 2014, and Plaintiff was required to bring suit, pursuant to Counts 2 through 9, 19 through 22, 24, 25, 27, and 28, no later than February 14, 2016. New Jersey's two-year statute of limitations on personal injury claims therefore bars: (1) Plaintiff's statutory claims under 42 U.S.C. § 1982 (Count 19), 42 U.S.C. § 1983, including for retaliatory prosecution and bystander liability (Count 3, 4, 5, 6, 7, and 9), 42 U.S.C. § 1985 (Counts 20 and 21), and the New Jersey Civil Rights Act, N.J.S.A. § 10:6-2(c) (Count 8); (2) Plaintiff's claims under the New Jersey Constitution and the First, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution (to the extent Plaintiff alleges independent causes of action on the basis thereof) (Counts 2, 4, and 28); and (3) Plaintiff's common law claims of civil conspiracy (Count 22), false imprisonment and false arrest (Count 24), invasion of privacy (Count 25), and intentional infliction of emotional distress (Count 27). Each of those Counts is dismissed in its entirety.

### B. Failure to State a Claim

Turning to Plaintiff's claims that are not time-barred, the Court finds that the vast majority fail to state a claim upon which relief may be granted. Despite the breadth of facts, claims, and Defendants in the Amended Complaint, Plaintiff fails to supply facts that would support a claim entitling her to relief under: (1) Counts 10 and 11 (as to any Defendant other than Steven Lepore); and (2) Counts 1, 12 through 18, and 23 (as to any Defendant). Accordingly, Counts 1, 12 through

18, and 23 are dismissed without prejudice, and Counts 10 and 11 are partially dismissed without prejudice.

### i.    42 U.S.C. § 1981 (Counts 1 and 10)

Count 1 of the Amended Complaint charges the North Arlington PD, the Bergen Sheriff, Chief Ghione, Judge Doyne, Judge Steele, Judge Rosa, Bern, and Schmitt with violations of "42 U.S.C. § 1981, through Section 1983 and 28 U.S.C. § 1658[.]" Am. Compl. p. 33.  Plaintiff claims Defendants "hid, tampered with, hindered, or destroyed evidence . . . about Plaintiff being subjected to racial slurs" and "intentionally, routinely, and systematically attacking the constitutional rights of African-American tenants." Id.  It is not exactly clear which Defendants are charged with which conduct under Count 1, but Plaintiff believes they were all "motivated in substantial part by racial animus[.]" Id.  Count 1 does not set forth a claim under which relief may be granted.

Section 1981 protects the equal right of "[a]ll persons within the jurisdiction of the United States" to "make and enforce contracts" without respect to race.  Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 474 (2006) (quoting 42 U.S.C. § 1981(a)).  "Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship,' . . . under which the plaintiff has rights." Id. at 476 (citing 42 U.S.C. § 1981(b)).  Section 1981 does not, as Plaintiff seems to assert, establish a private right of action against state actors generally.  McGovern v. City of Philadelphia, 554 F.3d 114, 122 (3d Cir. 2009).[7]  Since Plaintiff has not alleged any contractual

---

[7] Plaintiff incorrectly frames Count 1 as a claim under "42 U.S.C. § 1981, through Section 1983 and 28 U.S.C. § 1658." Am. Compl. p. 33.  First, 28 U.S.C. § 1658 is a provision governing statutes of limitations; it does not provide a substantive avenue of relief.  Second, when a plaintiff's contract is with a government entity, any Section 1981 claim must be brought through Section 1983, because "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." McGovern, 554 F.3d at 120 (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989)).

relationship with any state actor Defendant named in Count 1, she has not set forth a Section 1981 claim against any of them.

Count 10 of the Amended Complaint also alleges violations of Section 1981 by the Lepores, Byrne, Fontinha, the Griecos, Rosensweig, A&R, Kwapniewski, and Coccia. Plaintiff claims these Defendants "violated, interfered with, impermissibly burdened, and extinguished Plaintiff's right to hold a leasing contract for private property" through actions such as "padlocking her doors, threatening her in the hallways, filing false police reports, turning off her heat and utilities, cutting her doorbell, throwing trash on the property. . . ." Am. Compl. p. 44. She believes they "were motivated by racial animus as evidence by racial slurs, threats that were caught on video (including calling Plaintiff a 'monkey' and threatening to stab her dog), spitting on Plaintiff, falsifying police reports against Plaintiff, etc." Id.

Plaintiff has not alleged that she entered into a contract with any Defendant named in Count 10 except Steven Lepore, with whom she claims she entered into her apartment lease. Again, because Section 1981 claims require that the plaintiff and defendant have some sort of contractual relationship, Domino's Pizza, Inc., 546 U.S. at 477, Plaintiff does not state a 1981 claim against Donna Lepore, Byrne, Fontinha, the Griecos, Rosensweig, A&R, Kwapniewski, or Coccia. The 1981 claims against them are dismissed without prejudice.

That leaves Steven Lepore. The Court will not dismiss the 1981 claim against him at this stage. Plaintiff alleges a contractual relationship with Steven Lepore vis-à-vis the lease, and alleges that he interfered with the terms of it, and ultimately evicted Plaintiff, for discriminatory reasons. The right to "make and enforce" contracts under Section 1981 "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Under

Plaintiff's theory, Steven Lepore's performance under the lease agreement was motivated by racial animus. Plaintiff's foundation for this belief appears attenuated, but the Court will let the 1981 claim proceed because dismissal at this stage would be inappropriate. See Phillips, 515 F.3d at 231 (noting that dismissal of a claim is not appropriate simply because "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits").

In sum, the Court dismisses Counts 1 and 10 as to all Defendants without prejudice, except for the Section 1981 claim against Steven Lepore in Count 10, which will proceed.

## ii. Tenant's Reprisal Act (Count 11)

In Count 11, Plaintiff alleges that the Lepores violated the Tenant Reprisal Act (the "TRA"), which provides for actions against landlords who "institute any action against a tenant to recover possession of premises" as a reprisal for: (a) "the tenant's efforts to secure or enforce any rights under the lease or contract, or under the laws of the State of New Jersey or its governmental subdivisions, or of the United States"; (b) "the tenant's good faith complaint to a governmental authority of the landlord's alleged violation of any health or safety law, regulation, code or ordinance, or State law or regulation which has as its objective the regulation of premises used for dwelling purposes"; (c) "the tenant's being an organizer of, a member of, or involved in any activities of, any lawful organization"; or (d) "the tenant's failure to comply with the terms of the tenancy as altered by the landlord" if such altered terms were a reprisal for tenant's actions as protected by (a), (b), or (c). N.J.S.A. § 2A:42-10.10. Under subsection (b), a tenant must "bring his good faith complaint to the attention of the landlord or his agent and give the landlord a reasonable time to correct the violation before complaining to a governmental authority." Id.

Plaintiff's theory of liability is somewhat unclear, but the Amended Complaint contains facts that could plausibly support a claim under the TRA. Plaintiff allegedly took several actions

that would be protected from reprisal by the TRA, including (1) Plaintiff's complaints to the Health Department on or around October 8, 2013, (2) Plaintiff's filing of a police report against Theresa Grieco in August 2013, and (3) Plaintiff's refusal to comply with altered terms of her tenancy (e.g., taking away her guest parking spot and padlocking the apartment building's basement), which were themselves an alleged reprisal for Plaintiff's filing of the police report against Theresa Grieco. See Am. Compl. p. 4, 11, 44.

Importantly, the Amended Complaint alleges these actions took place <u>before</u> eviction proceedings against Plaintiff were commenced. To the extent Plaintiff alleges her eviction was a reprisal for actions taken <u>after</u> those proceedings were commenced, those allegations are facially implausible and do not state a claim for relief under the TRA. Because she alleges the specific actions discussed above, however, Plaintiff does state a claim under the TRA against Steven Lepore. Plaintiff has not alleged that Donna Lepore was her landlord, though, and the Court will dismiss Count 11 as to Donna Lepore without prejudice.

### iii.   New Jersey Consumer Fraud Act (Count 12)

In Count 12 of the Amended Complaint, Plaintiff charges the Lepores, Rosensweig, A&R, Kwapniewski, and Coccia with violations of the New Jersey Consumer Fraud Act ("NJCFA"). She alleges assorted misconduct, including, in part, (1) that "the landlords"[8] rented an apartment to her, and then sought to evict her, without having a CO; (2) that "the landlords made false representations in state court, including an affidavit stating they were able to collect rent"; (3) that Rosensweig, A&R, Kwapniewski, and Coccia "were all on notice of the absence of the CO and failure to comply with code requirements" and nonetheless "assisted the landlord in depriving the

---

[8] Plaintiff refers interchangeably to her "landlord" and her "landlords." She does not specify any landlord other than Steven Lepore.

tenant of her rights"; (4) that "[t]he realtors . . . sought to compel Plaintiff to give them access to her apartment by falsely stating she was obligated to do so" and "threatened, verbally-abused, and stigmatized her"; and (5) that "Rosensweig submitted false records to the court." Am. Compl. p. 45-46. None of Plaintiff's allegations state an NJCFA claim, and thus Count 12 must be dismissed in its entirety.

The NJCFA prohibits:

> [th]e act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice ....

N.J.S.A. § 56:8-2. A plaintiff must establish three elements for a NJCFA claim to survive a motion to dismiss: (1) unlawful conduct, (2) an ascertainable loss, and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss. In re AZEK Building Prods., Inc. Mktg. & Sales Practices Litig., 82 F.Supp.3d 608, 623 (D.N.J. 2015). "An ascertainable loss is a loss that is quantifiable or measurable; it is not hypothetical or illusory." Zodda v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., No. 13-7738, 2015 WL 926221, at *9 (D.N.J. Mar. 4, 2015) (quoting Lee v. Carter–Reed Co., 203 N.J. 496, 4 A.3d 561, 576 (2010)).

First, much of the alleged misconduct, such as Plaintiff's claim that her landlord's realtor "threatened, verbally-abused, and stigmatized" Plaintiff, does not concern "the sale or advertisement of any merchandise or real estate" or any "subsequent performance" in connection therewith. See N.J.S.A. § 56:8-2. Second, Plaintiff's NJCFA claim is subject to the heightened pleading requirements of Rule 9(b), see Frederico, 507 F.3d at 202-03, and Plaintiff fails to "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure

of substantiation into a fraud allegation." <u>Id.</u> at 200. The general nature of Plaintiff's claims, including, for example, allegations that "the landlords . . . rented an apartment without securing the required CO[,]" failed to remediate "blatant fire code violations[,]" and committed "acts of harassment, intimidation, and terror[,] <u>Am.</u> <u>Compl.</u> p. 45, do not approach Rule 9(b)'s exacting standard. Third, Plaintiff fails to allege the damages she suffered and the causal connection to specific misconduct by specific Defendants.

For all of the foregoing reasons, Count 12 does not state a claim under the NJCFA, and it is dismissed without prejudice.

### iv.    Breach of Contract (Count 13)

Count 13 of the Amended Complaint charges the Lepores with breach of contract. Plaintiff claims that they "did not perform their obligations under the contract, and the Plaintiff suffered damages as a result." Am. Compl. p. 46. This Count does not state a claim against either Steven Lepore or Donna Lepore upon which relief may be granted.

In New Jersey, a plaintiff must allege three elements to state a cause of action for breach of contract: (1) a valid contract, (2) breach of that contract, and (3) damages resulting from that breach. <u>Ramada Worldwide Inc. v. Courtney Hotels USA, LLC</u>, No. 11-896, 2012 WL 924385, at *3 (D.N.J. Mar. 19, 2012). Presumably, Plaintiff is claiming that Defendants breached Plaintiff's lease agreement with them, but: (1) the Amended Complaint specifies that Steven Lepore is her landlord, not Donna Lepore; and (2) Plaintiff fails to point to any specific obligation in the lease agreement, to specify how it was breached, or to outline the damages allegedly flowing from that breach. Plaintiff does not state a claim for breach of contract against Steven Lepore or Donna Lepore, and Count 13 is dismissed without prejudice.

### v.    Breach of Covenant of Good Faith and Fair Dealing (Count 14)

Count 14 of the Amended Complaint charges the Lepores with breach of the covenant of good faith and fair dealing. Plaintiff claims that "Defendants acted with bad motives, and engaged in deception and evasion, in the performance of the leasing contract." Am. Compl. p. 46. She characterizes her eviction "pursuant to a breach of the rent provision of the lease" as "pretext for a spur-of-the-moment retaliatory eviction that deprived Plaintiff of the benefit of their bargain." Id. Plaintiff's breach of the covenant of good faith and fair dealing claim suffers from the same infirmities as her breach of contract claim, and it does not state a claim against Steven Lepore or Donna Lepore.

Graddy v. Deutsche Bank lays out the requirements for a breach of covenant of good faith and fair dealing claim:

> In order to succeed on a claim for breach of the covenant of good faith and fair dealing, a plaintiff must prove that: (1) a contract exists between the plaintiff and the defendant; (2) the plaintiff performed under the terms of the contract [unless excused]; (3) the defendant engaged in conduct, apart from its contractual obligations, without good faith and for the purpose of depriving the plaintiff of the rights and benefits under the contract; and (4) the defendant's conduct caused the plaintiff to suffer injury, damage, loss or harm.

No. 11-3038, 2013 WL 1222655, at *4 (D.N.J. Mar. 25, 2013). Count 14 fails to plead multiple elements. First, Plaintiff presumably refers to her lease agreement, but she does not specify the terms of the contract or even that Donna Lepore is a party to the lease agreement. Second, Plaintiff fails to allege that she in fact performed under the contract, which is especially glaring in light of Plaintiff's eviction for non-payment of rent. Count 14 does not state a claim for breach of the covenant of good faith and fair dealing and is dismissed without prejudice.

### vi.    Tortious Interference with Contract (Count 15)

Count 15 of the Amended Complaint charges Byrne, Fontinha, and the Griecos with tortious interference with contract. Plaintiff claims that they "acted with malice aforethought in

attacking Plaintiff's relationship with the landlords, police, and city." Am. Compl. p. 46. She believes they were motivated by racial animus, as well as "retaliation, especially after Plaintiff filed police and court complaints against Theresa Grieco for criminal violence . . . [and] reported the placement of porn in the common areas of the building[.]" Id. p. 47. Plaintiff claims they "exercised leverage" with Lepore because they "collectively paid more rent than the Plaintiff." Id. These allegations do not state a claim for tortious interference with contract as to any Defendant, and Count 15 is thus dismissed without prejudice.

Under New Jersey law, tortious interference claims require a plaintiff to establish four elements: "(1) a protected interest—either a prospective economic or contractual relationship; (2) malice, i.e., intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the (prospective economic or contractual) gain; and (4) resulting damages." Baxter Healthcare Corp. v. HQ Specialty Pharma Corp., 157 F.Supp.3d 407, 420 (D.N.J. 2016) (citing N.J. Physicians United Reciprocal Exch. v. Boynton & Boynton, Inc., 141 F.Supp.3d 298, 309, No. 12-5610, 2015 WL 5822930, at *8 (D.N.J. Oct. 1, 2015) (citations omitted); Cargill Glob. Trading v. Applied Dev. Co., 706 F.Supp.2d 563, 575 (D.N.J. 2010) (citations omitted); Matrix Essentials, Inc. v. Cosmetic Gallery, Inc., 870 F.Supp. 1237, 1246 (D.N.J.1994), aff'd, 85 F.3d 612 (3d Cir. 1996)).

Plaintiff's general theory of tortious interference with contract is that her neighbors maliciously conspired against her in order to have her evicted. Plaintiff fails to specify, however, the nature of the alleged interference or the benefits in her lease she lost as the result of their interference. The few specific allegations Plaintiff actually makes do not support her claim in Count 15. For example, Plaintiff alleges the Lepores "padlocked Plaintiff's access to the basement because of false reports by the co-tenants[,]" Am. Compl. p. 47, but does not allege what these

reports were, why they were false, or that Plaintiff was otherwise entitled to basement access under the terms of her lease. Likewise, Plaintiff was allegedly told by Coccia and the Construction Department "that the co-tenants were not removing the property that they had obstructing the fire exits unless Plaintiff's furniture [was] thrown in the trash, thereby impeding remediation of code violations." Id. This, too, plainly fails to establish a claim for tortious interference with contract, as it is seemingly unrelated to any contractual benefit alleged by Plaintiff. Count 15 is dismissed without prejudice.

### vii. Tortious Interference with Prospective Economic Advantage (Count 16)

In Count 16, Plaintiff also brings a claim for tortious interference with prospective economic advantage against Byrne, Fontinha, the Griecos, and the Lepores. Plaintiff's attenuated theory is that, if the foreclosed apartment building was ultimately sold, the buyer would have had to give Plaintiff "cash for keys" if they wished to evict her prior to the expiration of her lease. Count 16 fails to state a claim against any of the Defendants.

Claims for tortious interference with prospective economic advantage require the same elements as claims for tortious interference with contract, except that a Plaintiff must show a prospective economic relationship rather than a current contractual one. See Baxter Healthcare Corp., 157 F.Supp.3d at 420 (citing N.J. Physicians United Reciprocal Exch., 141 F.Supp.3d at 309 (citations omitted)). Accordingly, Count 16 fails for similar reasons as Count 15: Plaintiff fails to specify the nature of the alleged interference or to explain why she was entitled to this supposed future benefit. Under the Plaintiff's own theory, even if the property was ultimately purchased, Plaintiff would not have been entitled to "cash for keys" unless the purchaser chose to end her lease early, nor if there were grounds for evicting Plaintiff anyway. For these reasons,

Plaintiff fails to state a claim for tortious interference with prospective economic advantage, and Count 16 is dismissed without prejudice.

### viii.    Malicious Abuse of Process (Count 17)

Count 17 of the Amended Complaint charges Rosensweig, A&R, and the Lepores with malicious abuse of process.  Plaintiff alleges that "after the court issued Warrants of Removal in each case, defendants used the court's rulings in [a] perverted manner to intimidate and harass the Plaintiff, including interfering with her property rights, instigating police action and a forcible eviction, evading prosecution, acts of violence and threats, etc."  Am. Compl. p. 48.  These allegations do not state for malicious abuse of process.

"To establish a claim for malicious abuse of process, a plaintiff must show (1) the defendant has set legal process in motion for an improper ulterior purpose, and (2) the defendant has committed a willful act in the use of process which perverts the regular conduct of the proceeding to accomplish the improper purpose."  Dunne v. Twp. of Springfield, No. 08-5605, 2011 WL 2269963, at *8 (D.N.J. Jan. 31, 2011), aff'd, 500 Fed.Appx. 136 (3d Cir. 2012) (citing Voytko v. Ramada Inn of Atlantic City, 445 F.Supp. 315, 325 (D.N.J. 1978)).  "[B]asic to the tort of malicious abuse of process is the requirement that the defendant perform 'further acts' after issuance of process 'which represent the perversion or abuse of the legitimate purposes of that process.'"  Id. (quoting Baglini v. Lauletta, 338 N.J. Super. 282, 294 (App. Div. 2001)).

Plaintiff has not plausibly pled any "further acts" that constitute abuse of the eviction process.  Plaintiff accuses Defendants with "interfering with her property rights, instigating police action and a forcible eviction, evading prosecution, acts of violence and threats, etc." Am. Compl. p. 48.  After the first Warrant of Removal was issued, however, Plaintiff was no longer legally entitled to occupy her apartment, and she does not identify incidents of "intimidation" or

"harassment" other than those constituting efforts to enforce the Warrants of Removal (with which Plaintiff refused to comply, leading to her forcible eviction by Bergen SWAT). Those acts were not an abuse of the eviction process; they were part of the eviction process. See, e.g., Penway Prop. Co. v. Landau, 372 A.2d 1162 (N.J. App. Div. 1977) ("In the absence of some coercive or illegitimate use of the judicial process there can be no claim for its abuse."). Count 17 is dismissed without prejudice.

### ix.    Malicious Use of Process (Count 18)

Count 18 of the Amended Complaint charges Rosensweig, A&R, and the Lepores with malicious abuse of process. Plaintiff claims they "commenced two eviction actions without justification or probable cause. The ostensible reason was to collect rent and attorney fees, but . . . the reasons were malicious." Am. Compl. p. 48. It does not state a claim upon which relief may be granted.

Malicious use of process is distinct from malicious abuse of process, and it entails separate elements. To successfully bring a claim for malicious use of process, the plaintiff must show: "(1) an action was instituted by the defendant against the plaintiff; (2) the action was motivated by malice; (3) there was an absence of probable cause to prosecute; (4) the action was terminated favorably to plaintiff; and (5) the plaintiff has suffered a special grievance." Dunne, 2011 WL 2269963, at *4 (citing LoBiondo v. Schwartz, 199 N.J. 62, 90 (2009)).

Plaintiff attempts to artfully plead around the elements of a malicious use of process claim, stating that "[t]he Oct. 2013 eviction terminated favorably to the Plaintiff" and the "Feb. 2014 eviction would likewise have ended favorably, as a matter of law, had the judicial-defendants addressed the absence of a CO, reprisal, and harassment." Am. Compl. p. 48. She simply cannot state a claim for malicious use of process, however, because the eviction actions were not

terminated favorably to her.  An order of eviction was entered against her.  Am. Compl. p. 5.  Even if the first eviction proceeding was considered distinct from the second for purposes of her claim here, Plaintiff has not alleged an absence of probable cause to prosecute, nor that she has suffered a special grievance.  Count 18 must be dismissed, because it contains nothing more than "a formulaic recitation of the elements of a cause of action."  Bell Atl. Corp., 550 U.S. at 555.

### x.     Common Law Fraud (Count 23)

Count 23 of the Amended Complaint charges all Defendants, other than North Arlington, with common law fraud.  Against many of the Defendants, Plaintiff provides no factual basis whatsoever for her claims of fraud.  Against the others, she lodges general allegations, such as: (1) "Defendants made material misrepresentations of fact"; (2) "[t]he police . . . made fraudulent representations to Plaintiff about the preservation of evidence and release of discovery"; (3) "Schmitt and Doherty made false representations about the Health Dept.'s processes, including whether the dept. tracked complaints"; (4) Hoffman made false representations about whether he had served process"; and (5) "[t]he judicial staff made false representations about Plaintiff's access to court administrative services . . . ."  Am. Compl. p. 51.  It does not state a claim against any Defendant upon which relief may be granted.  All of Plaintiff's allegations of fraud lack the requisite level of specificity under Rule 9(b).

To state a claim for common law fraud, a plaintiff must plead sufficient facts to support the following elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge of belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting in damages."  Gotthelf v. Toyota Motor Sales, U.S.A., Inc., 2012 WL 1574301, at *17 (D.N.J. May 3, 2012), aff'd, 525

Fed.Appx. 94 (3d Cir. 2013). Plaintiff's fraud claims are subject to the heightened pleading requirements of Rule 9(b). See Frederico, 507 F.3d at 202-03.

In general, Plaintiff uses conclusory language to allege "fraud" and "misrepresentations" against her, but fails to inject specificity into when, where, and by whom such misrepresentations were made. Plaintiff further fails to allege why any specific misstatement or misrepresentation was made with the intent that Plaintiff rely on it, that Plaintiff indeed relied on it, or that it actually resulted in any damages to Plaintiff. Even reading the sprawling Amended Complaint in the light most favorable to Plaintiff, there is simply no basis for a fraud action against any of the Defendants. Count 23 is dismissed without prejudice.

### xi. State Law Offenses Against Plaintiff's Property Rights (Count 26)

Count 26 charges the Lepores, Rosensweig, A&R, North Arlington PD, Chief Ghione, Judge Doyne, Judge Steele, Judge Rosa, Bern, and Hoffman with "State Law Offenses Against Plaintiff's Property Rights, Including Trespass, Conversion, Negligence, Unjust Enrichment, and Property Damage." Am. Compl. p. 52. The entirety of Plaintiff's explanation of these charges is as follows:

> Defendants maliciously converted Plaintiff's property on Feb. 14, 2014. Upon information and belief, defendants then removed Plaintiff's property from the leased premises on a date after the forcible eviction. Yet, even after service of the Notice of Claim, they have made no effort to advise Plaintiff of the disposition of her property or of her attendant rights.

Id. p. 53.

Defendants argue, inter alia, that Plaintiff's claims are barred by sovereign immunity, qualified immunity, and the Rooker-Feldman doctrine, but the Court cannot evaluate these arguments in light of Plaintiff's bare-bones allegations. It is impossible to tell, for instance, whether Plaintiff essentially seeks review of Judge Steele's eviction order or Warrants of Removal,

36

which may be barred by <u>Rooker-Feldman</u> doctrine, <u>see</u> <u>Exxon Mobil Corp. v. Saudi Basic Indus.</u> <u>Corp.</u>, 544 U.S. 280, 284 (2005), or whether Plaintiff is alleging some additional conduct unrelated to enforcement of the state court judgment(s). Similarly, the Court cannot dismiss on the basis of sovereign or qualified immunity given the utter lack of clarity as to what Plaintiff is claiming.

Rather, the Court must dismiss Count 26 because it fails to state a claim upon which relief may be granted. The alleged offenses against Plaintiff's property rights are merely "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atl.</u> <u>Corp.</u>, 550 U.S. at 555. Plaintiff's allegations amount to mere speculation, and she fails to put forth any actionable conduct in connection with Count 26. It is dismissed without prejudice.

## IV.     Plaintiff's Miscellaneous Filings

This Opinion renders moot a number of motions, requests, and/or letters filed by Plaintiff, including, but not limited to: (1) Plaintiff's Motion to Substitute Parties Under FRCP 25(d), Amend Case Caption, Rule 4 Service by U.S. Marshals Upon FRCP 25(d) Defendants, and Definite Briefing Schedule Setting Timeframe for Any Responses Due by Plaintiff to Filings by FRCP 25(d) Defendants, ECF No. 84; (2) Plaintiff's Objection #1, ECF No. 85; (3) Plaintiff's Motion for Reconsideration Per Local Rule 7.1(i), such that the Court Provides a More Definite Order and Addresses Plaintiff's Request for Leave to File for Sanctions, ECF No. 88; (4) Plaintiff's Motion for Entry of a Preservation Order, Striking Points from Bergen County's "Motion to Dismiss Plaintiff's Complaint", Default Judgment and Entry of Injunctive Relief, Default Judgment and Entry of Declaratory Judgment, and Adverse Inference Instruction, ECF No. 89; (5) Plaintiff's Request for Rule 15(2) Leave to Amend Complaint (to file Second Amendment), ECF No. 103; (6) Plaintiff's Objection #2, ECF No. 104; (7) Reminder re: Plaintiff's Objection #1, ECF No. 108. These filings are excessive and unnecessary given the state of Plaintiff's case, and

Plaintiff must obtain leave from the Court before renewing any of those motions or filing any new requests, motions, or documents in this matter.

Plaintiff has also requested leave to file a Second Amended Complaint. <u>See</u> ECF No. 103. The applicable motions and requests pertaining to Plaintiff's requested amendments are terminated, but the Court hereby grants Plaintiff leave to include such amendments in any refiling in accordance with the Court's opinion today. Plaintiff will be granted **<u>one</u>** additional opportunity to file an amended complaint. Plaintiff should be carefully guided by this Opinion, and should take notice of claims that are time-barred and allegations that do not state a basis for relief.

## V.     Conclusion

For the reasons set forth herein, (1) Defendants' motions to dismiss are all granted; (2) Counts 1 through 9, 19 through 22, and 24 through 28 are dismissed with prejudice; (3) Counts 10 and 11 (other than with respect to Defendant Steven Lepore), Counts 12 through 18, and Count 23 are dismissed without prejudice subject to Plaintiff's refiling **<u>within 30 days</u>** of the date of this Opinion; and (4) Plaintiff is ordered to obtain leave from the Court before submitting or filing any other documents or materials in this matter. An appropriate Order will follow shortly.

**Dated: March 28, 2018**

*/s Madeline Cox Arleo*_____
**Hon. Madeline Cox Arleo**
**United States District Judge**
